**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| EDNA DOAK, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 12-1177 (RC) |
| | : | | |
| v. | : | Re Document No.: | 14 |
| | : | | |
| JEH JOHNSON,[1] | : | | |
| Secretary, United States | : | | |
| Department of Homeland Security | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Edna Doak brings this employment discrimination action against Jeh Johnson, the

Secretary of Homeland Security ("Department"), in his official capacity.  Ms. Doak alleges that

her employer, the United States Coast Guard ("USCG"),[2] discriminated against her, and

retaliated against her on the basis of her disabilities in violation of section 501 of the

Rehabilitation Act of 1973, codified at 29 U.S.C. § 791, *et seq*.  The Department moved to

dismiss for failure to exhaust certain claims and also moved for summary judgment on all claims.

For the reasons that follow, the Court will grant the Department's motion on both grounds.

---

[1]      The plaintiff originally brought suit against Janet Napolitano, the Secretary of
Homeland Security, at the time she filed her complaint on July 18, 2012.  Pursuant to Fed. R.
Civ. P. 25(d), Jeh Johnson is automatically substituted as the defendant, as he succeeded her in
office on December 23, 2013.
[2]      The United States Coast Guard is a component of the United States Department of
Homeland Security.  *See* Def.'s Mot. Summ. J. 1, ECF No. 14.  *See also*
http://www.uscg.mil/top/about/ (last accessed January 7, 2014).

## II. FACTUAL BACKGROUND

Edna Doak was employed as a Program Analyst for the United States Coast Guard from November 2007 through August 2009, and as a Management Program Analyst from August 2009 through October 2010. Compl. ¶¶ 5–6, ECF No. 1. Her day-to-day responsibilities were to support the Surface Program, which included "[w]atching the budget, preparing obligation plans, working with the program manager, doing procurement requests," and "[m]eeting with the program manager and the support team" to plan for the building of boats. Doak Dep. 21:24–25, 22:1–9, ECF No. 16-13. Her position required frequent interaction with others. *See* Def.'s Resp. to Interrogatory 3, ECF No. 16-1.

Ms. Doak's scheduled start time at work was 8:15 a.m. *See* Def.'s Ex. 27, ECF No. 14-20 ("[m]y start time since 26 November 2007 has been 0815."); Def.'s Ex. 24, ECF No. 14-19. This was one of the later start times of anyone on her team. *See* Souther Dep. 49:12–15, ECF No. 14-3; Cohen Dep. 64:16–19, ECF No. 14-2. The USCG's Acquisition Directorate Standard Operating Procedure defines the designated working hours as "normally the hours between 0600 and 1800 Monday through Friday. The CG-9 directorate is closed on weekends and government holidays." *See* Def.'s Ex. 7 ¶5.f, ECF No. 14-7. The USCG policy also allowed for flexible hours, but stated that "[w]ork must be performed between the hours of 0600-1800, with all CF-9 employees/members present during the core hours of 0930-1030 and 1330-1430, Monday through Friday." *See id.* ¶ 7(a)(1).

Ms. Doak suffers from hypothyroidism and depression. She was diagnosed with both of these in 1993. Doak Decl. ¶¶ 9, 10, Pl.'s Ex. A, ECF No. 17-1. In June 2009,[3] Ms. Doak was in a car accident where she alleges that she "suffered closed head trauma." Doak Decl. ¶ 6. As a result, she began to suffer from migraines, various bodily pains, and obstructive sleep apnea. Doak Decl. ¶ 8. In August 2009, Ms. Doak submitted a request for intermittent leave under the Family and Medical Leave Act ("FMLA") because of the medical problems that resulted from her car accident. Greg Cohen, her supervisor, approved of that leave in September 2009. Def.'s Statement Undisputed Facts ¶ 7, ECF No. 16. Mr. Cohen was Ms. Doak's first-line supervisor; her second-line supervisor was Rory Souther, Chief of Acquisition Resources Management. *Id.* ¶¶ 2–3.

Around December 2009, Mr. Cohen met with Ms. Doak to discuss her inability to work a nine-hour shift and discuss the fact that she was absent from work a lot due to her illness. *See* Def.'s Ex. 6 at 1–2, ECF No. 14-6, Def.'s Ex. 8 at 6, ECF No. 14-8. On January 19, 2010, Mr. Cohen issued an Employment Status Memorandum requesting that Ms. Doak return to full-time duty immediately because she had nearly exhausted her FMLA leave, and her absences were disrupting the work routine and having a negative impact on her projects. *See* Def.'s Ex. 9 ¶ 2, ECF No. 14-9. In that letter, he explained that as of January 19, 2010, Ms. Doak had used 11.5 weeks of FMLA leave, and only had 2.5 days remaining, and that she currently had negative leaves balances of 233 hours of sick leave and negative 35.15 hours of annual leave. *Id.* ¶ 3. He further explained that Ms. Doak's "excessive absences and continued failure to submit

---

[3] The defendant asserts that the car accident occurred around August 2009. *See* Def.'s Statement Undisputed Facts ¶ 7, ECF No. 16. Ms. Doak testified that her accident occurred in June 2009. *See* Doak Dep. 18:12-13, ECF No. 16-13. The difference in date is not material to this case. The fact remains that at some point between June 2009 and August 2009, Ms. Doak was in a car accident that had subsequent deleterious effects on her health.

appropriate requests for leave in advance cannot continue to be excused and may result in disciplinary action taken against" her. *Id.* ¶ 4.

Despite this letter, Ms. Doak was absent without leave ("AWOL") for several hours each on January 25, 2010, and January 26, 2010. On January 25, 2010, Mr. Cohen wrote another memorandum to Ms. Doak explaining that she had exhausted her FMLA leave and that she had to return to full-time duty status. *See* Def.'s Ex. 11, ECF No. 14-11. On February 22, 2010, Mr. Cohen officially reprimanded Ms. Doak by letter for being AWOL on January 25 and January 26, 2010. *See* Def.'s Ex. 12, ECF No. 14-12. However, the Department agreed to hold the official reprimand letter in abeyance so that Ms. Doak could provide medical documentation to support her absences (1) unrelated to her FMLA leave; (2) her AWOL absences on January 25 and 26, 2010, and (3) her pending or outstanding leave requests related to medical issues. *See* Def.'s Ex. 13, ECF No. 14-13. On March 24, 2010, Mr. Cohen submitted a request for medical documentation to Ms. Doak, because the documentation she had provided, *see, e.g.*, Def.'s Ex. 14, ECF No. 16-4, did not support her "absenteeism nor did it clearly address a diagnoses or whether [her] medical conditions require reasonable accommodations." Def.'s Ex. 15, ECF No. 14-14.

On April 16, 2010, Ms. Doak provided medical documentation to Mr. Cohen through her doctor, Dr. Elizabeth P. Berbano. *See* Def.'s Ex. 16, ECF No. 16-5. In Dr. Berbano's letter, she explained that Ms. Doak suffered from various impairments such as major depressive disorder, obstructive sleep apnea, hypothyroidism, and migraines. *See id.* She also recommended that Ms. Doak be given the following "accommodations to facilitate increased work or productivity: (a) telecommuting from home, (b) full-spectrum light for her work space," "(c) anti-glare computer screen (glare precipitates migraines), (d) work in an area in which she is not subject to

cold air currents that cause her muscle tension in the neck and head," "(e) consideration for adjustment of work schedule from 11 AM to 7 PM because of the difficulty of arising in the morning," and "(f) consideration for the option of weekend hours to make up for weekday hours missed." *Id.*

The Coast Guard's Division of Operational Medicine and Medical Readiness reviews requests for accommodations made by civilian employees. Def.'s Statement Undisputed Facts ¶ 21, ¶ 35. Dr. Erica Schwartz, a physician in the Division of Operational Medicine evaluated the April 16, 2010 letter from Dr. Berbano and recommended to Mr. Cohen[4] that the following accommodations be provided: (1) the addition of fluorescent light filters to existing lights, (2) an anti-glare filter for the computer monitor, (3) use of sunglasses or anti-glare glasses, (4) noise-canceling headsets, and (5) a dark, private area for use when medically necessary. *See* Def.'s Ex. 17,[5] ECF No. 16-6. Dr. Schwartz found the requests for telecommuting, a later start time, and weekend hours to be medically unsupported, so she did not recommend those accommodations to Mr. Cohen. *See* Schwartz Dep. at 12:12–13:14, ECF No. 16-15.

On May 6, 2010, Mr. Cohen provided Ms. Doak with "a noise cancelling headset and anti-glare screen for [her] computer screen, permitted her to wear sunglasses in the office as needed, asked that three of the overhead lights directly above her desk be turned off, and identified break rooms that the Plaintiff could use as necessary for medical reasons." Def.'s Statement Undisputed Facts ¶ 40. Mr. Cohen did not provide Ms. Doak with an 11:00 a.m. start time because, he explained, "her position with an acquisition project required daily and frequent

---

[4] The record shows that Mr. Cohen did not have Ms. Doak's medical documentation record before him when evaluating her accommodation request, due to Ms. Doak's privacy concerns. *See* Def.'s Statement Undisputed Facts ¶ 33, ECF No. 14.

[5] This memorandum was issued by Dr. Schwartz's supervisor, Captain Mike Boquard.

interaction with project staff, other business managers, resource staff, and numerous agencies," and an 11:00 a.m. start time "would place the project and resource office in a hardship position." *Id.* ¶ 43. *See also* Def.'s Ex. 19 ¶ 4, ECF No. 16-7 ("Your billet is a matrix position with a Coast Guard acquisition project, which requires you to interact daily, and frequently with the project staff, other business managers and resource staff and numerous external agencies. I do not believe you will be able to meet those obligations with a work schedule that does not have you arrive until 1100 daily and therefore would place the project and resource office in a hardship position by requiring personnel from other projects to attend these meetings on the behalf of the resource office.").

In response, on May 21, 2010, Ms. Doak wrote to Mr. Cohen, explaining that she would prefer a 10:00 a.m. start time, but would "work toward a 9:00 a.m. arrival" time. *See* Def.'s Ex. 22, ECF No. 16-8. Mr. Cohen replied via email on June 1, 2010, explaining that a 10:00 a.m. start time was not acceptable; he instead offered her a 9:00 a.m. start time. *See* Def.'s Ex. 23, ECF No. 14-18. Ms. Doak did not accept a 9:00 a.m. start time at that time. Doak Dep. 237:7–18. As such, her scheduled start time remained 8:15 a.m. *See* Doak Dep. 238:2–9.

By the end of May 2010, Ms. Doak was arriving to work anywhere between 10:00 a.m. and Noon. *See* Doak Dep. 271:3–10. Mr. Cohen issued another letter of reprimand to her on May 24, 2010, based on more than 30 AWOL hours that she had incurred since her February 2010 letter of reprimand. *See* Def.'s Ex. 24, ECF No. 14-19.

On July 16, 2010, Ms. Doak submitted another letter from Dr. Berbano "clarifying" her April letter. *See* Def.'s Ex. 25, ECF No. 16-9. In that letter, Dr. Berbano modified her recommended start time to 9:30 a.m. *Id.* Dr. Brent Pennington responded to that request on July 20, 2010, stating that Dr. Berbano's letter did not provide medical justification for "an arbitrary

start time of 0930 instead of 0830 or 0900." Def.'s Ex. 26, ECF No. 16-10. On July 23, 2010, Ms. Doak agreed to a 9:00 a.m. arrival time at work. Def.'s Ex. 27, ECF No. 14-20. *See also* Souther Dep. 13, ECF No. 14-3. Despite that, she was still "unable to arrive at work on time." Def.'s Statement Undisputed Facts ¶ 61. In addition, Ms. Doak was also AWOL on July 27, 28, 29, 30, and August 2, 3, and 4, 2010. *Id.* ¶¶ 66-67. From January 31 to August 9, 2010, Ms. Doak had missed approximately 52 percent of her scheduled work hours. *Id.* ¶ 64. *See also* Def.'s Ex. 32 at 1, ECF No. 14-24.

On August 9, 2010, Mr. Cohen issued a notice to Ms. Doak of her proposed removal from her position due to (1) her "medical inability to perform the essential duties of [her] position, due to various medical reasons, which have caused [her] to be unable to maintain [her] regular work schedule," and (2) her hours in AWOL status. *Id.* ¶ 1. The union responded to the Notice of Proposed Removal on behalf of Ms. Doak on August 31, 2010. *See* Def.'s Ex. 33, ECF No. 14-25. On September 30, 2010, after considering the evidence before him, Mr. Souther determined that Ms. Doak's removal "was warranted to promote the efficiency of the service." *See* Def.'s Statement Undisputed Facts ¶ 68.

The plaintiff contacted an Equal Employment Opportunity ("EEO") counselor on October 6, 2010, challenging her September 30 removal. *Id.* ¶ 73. The Department entered into a settlement agreement under which it agreed to allow Ms. Doak to retire effective October 31, 2010 instead of being terminated. *Id.* ¶ 75. *See also* Def.'s Ex. 36, ECF No. 14-28. On February 22, 2011, Ms. Doak filed a formal complaint against the Department, and on June 19, 2012, the Department issued a final agency decision, in which it found that Ms. Doak "failed to prove by a preponderance of the evidence that USCG discriminated against" her. *See* Pl.'s Ex. 7, ECF No. 17-1.

Ms. Doak then filed the instant action, alleging that the Department discriminated against her by "discharging her from her employment because of her disability," and by failing to reasonably accommodate her disability. *See* Compl. Counts I & II. She also alleges that the Department retaliated against her by terminating her for requesting reasonable accommodations in violation of the Rehabilitation Act. *See* Compl. Count III. The Department moved to dismiss for Ms. Doak's failure to exhaust her reasonable accommodation claims and certain disparate[6] treatment claims, and moved for summary judgment on all claims. *See* Def.'s Mot. Summ. J. 2, ECF No. 14. The Court now turns to the relevant legal standards.

### III. ANALYSIS

### A. Legal Standards

#### 1. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction . . . ." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). It is the plaintiff's burden to establish that the court has subject matter jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely

---

[6]     In Count I of the Complaint, Ms. Doak alleges that "Defendant violated the Rehabilitation Act by discriminating against Plaintiff and discharging her from her employment because of her disability, its perception of her as if she were disabled, and its record of her disability." Compl. ¶ 26. Though not explicitly couched in "disparate treatment" terms, the parties' briefs reflect an understanding that Count I states plaintiff's disparate treatment claim. *See* Def.'s Mot. Summ. J. 24, 27, ECF No. 14; Pl.'s Opp'n Mot. 9, ECF No. 17. The Court also construes Count I as a disparate treatment claim and analyzes it as such.

devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974)).

Because subject matter jurisdiction focuses on the Court's power to hear a claim, the Court must give the plaintiff's factual allegations closer scrutiny than would be required for a 12(b)(6) motion for failure to state a claim. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001). Thus, the court is not limited to the allegations contained in the complaint. *See Wilderness Soc'y v. Griles*, 824 F.2d 4, 16 n.10 (D.C. Cir. 1987).

### 2. Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must

"eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## B. Failure to Exhaust

As a threshold matter, the defendant argues that Ms. Doak's failure to accommodate claim in Count II, and certain of her disparate treatment claims in Count I should be dismissed for failure to exhaust administrative remedies. Under the Rehabilitation Act, federal employees may file an action "only after exhausting their administrative remedies before the relevant agency for each allegedly discriminatory act." *Mahoney v. Donovan*, 824 F. Supp. 2d 49, 58 (D.D.C. 2011). "[F]ailure to exhaust administrative remedies is a jurisdictional defect, requiring dismissal for lack of subject-matter jurisdiction under Rule 12(b)(1)." *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012) (citing *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006)); *Moore v. Schafer*, 573 F. Supp. 2d 216, 219 (D.D.C. 2008). Because it is a jurisdictional requirement, "the plaintiff has the burden to plead and prove it." *Ellison*, 901 F. Supp. 2d at 124 (citing *Carty v. District of Columbia*, 699 F. Supp. 2d 1, 2 n.2 (D.D.C. 2010) ("under the Rehabilitation Act, exhaustion is a jurisdictional requirement that a plaintiff has the burden to plead and prove")).

Under the Rehabilitation Act, in order to exhaust, "an aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory . . . ." 29 C.F.R. § 1614.105(a)(1). The Counselor holds an initial counseling session, advises the complainant of certain rights, and holds a final interview. 29 C.F.R. § 1614.105(b)(1), (c),

(d).   If the matter is not resolved through counseling, the complainant may file a formal administrative complaint.  29 C.F.R. § 1614.106(b).  "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice[,]'" and a party must exhaust her administrative remedies for each discrete act of discrimination alleged or lose the ability to recover for it.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002).

As the plaintiff pled in her Complaint, she contacted an EEO counselor on October 6, 2010, challenging the Department's September 30, 2010 removal decision.  Def.'s Statement Undisputed Facts ¶ 73, Compl. ¶¶ 21–23.  She followed-up this conversation by filing a formal administrative complaint on February 22, 2011.  In the formal administrative complaint, Ms. Doak stated that she was subjected to a continuous "hostile work environment[7] . . . from January 2009 to September 30, 2010," citing issues spanning that entire time period, including the denial of certain proposed accommodations.  *See* Def.'s Ex. 35, ECF No. 14-27.  Her initial October 6, 2010 contact with an EEO counselor, however, occurred more than 45 days after USCG responded to Ms. Doak's request for accommodations:  Ms. Doak requested accommodations on April 16, 2010, and again on July 16, 2010, to which the Department responded on May 6, 2010, and July 20, 2010, respectively.[8]  Her October 6, 2010 contact with an EEO counselor (78 days after the final July 20, 2010 denial)—the first step in the administrative remedial process— therefore renders her failure to accommodate claims untimely.[9]

---

[7]     Ms. Doak does not raise a hostile work environment claim in her Complaint before this Court, nor were these issues raised in either party's briefs.

[8]     Ms. Doak does not quarrel with the Department's argument that the claim accrued upon the denial of her accommodation requests.

[9]     To make October 6, 2010 timely, the discriminatory action complained of would have to have occurred on August 22, 2010 or later.  Even the August 9, 2010 date Ms. Doak alleged was the date she first became aware of the discrimination (the date in which the

The plaintiff argues that USCG did not raise this failure to exhaust argument in the administrative proceedings,[10] and as such, waived it. *See Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 87-88 (D.D.C. 2009) ("waiver occurs when the agency decides the [administrative] complaint on the merits without addressing the untimeliness defense" (citation omitted)). *See also Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997); *Johnson v. Billington*, 404 F. Supp. 2d 157, 162 (D.D.C. 2005) ("when a complaint has proceeded through administrative channels prior to arriving at the federal courthouse, and the agency has accepted, investigated and decided that complaint on its merits without raising the exhaustion issue, the exhaustion defense may be found to have been waived"). However, where the relevant exhaustion inquiry is jurisdictional, as it is under the Rehabilitation Act, courts do not entertain equitable defenses such as waiver.[11] *See, e.g.*, *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 56 (D.D.C. 2010) ("exhaustion

_____

Department issued its notice of proposed removal) would not make her October 6, 2010 initial contact with an EEO counselor timely with respect to her failure to accommodate claims. *See* Doak Dep. 37:2–6, ECF No. 16-13.

[10]     As set forth above, the Department investigated Ms. Doak's formal complaint and issued a final decision on June 19, 2012. *See* Pl.'s Ex. 7, ECF No. 17-1. It did consider her failure to accommodate as well as her disparate impact claims, and at no point did it raise the timeliness argument. *Id.*

[11]     Not all district court judges in this court have agreed on this proposition, due to differing interpretations of the D.C. Circuit's decision in *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006). Most courts have read *Spinelli* as holding that the Rehabilitation Act's exhaustion requirement is jurisdictional, and therefore, not subject to equitable defenses, based on the court's language that: "[t]he district court also should have dismissed Spinelli's Rehabilitation Act claim *for lack of jurisdiction* on the ground that he failed to exhaust his administrative remedy. The Act limits judicial review to employees aggrieved by the final disposition of their administrative complaint." 446 F.3d at 162 (internal quotation marks and citations omitted) (emphasis added). *See, e.g.*, *Ellison v. Napolitano*, 901 F. Supp. 2d 118, 124 (D.D.C. 2012); *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16–17 (D.D.C. 2009); *Porter v. Jackson*, 668 F. Supp. 2d 222, 230 n.6 (D.D.C. 2009); *Int'l Union v. Clark*, No. 02-1484 (GK), 2006 WL 2598046, at *9–10 (D.D.C. Sept. 11, 2006). However, in *Koch v. Schapiro*, the court found the "final disposition of their administrative complaint" language in *Spinelli* more dispositive, and found that "because there was a final disposition of [the plaintiff's administrative] complaint— albeit by way of dismissal and not on the merits—his Rehabilitation Act claim is not foreclosed by *Spinelli v. Goss*," even though the plaintiff refused to participate in the administrative

of administrative remedies under the Rehabilitation Act is a jurisdictional requirement and, therefore, cannot be waived or tolled"); *Ragsdale v. Holder*, 668 F. Supp. 2d 7, 16–17 (D.D.C. 2009) ("The District of Columbia Circuit has interpreted the exhaustion requirement of section 501 of the Rehabilitation Act as presenting a strict jurisdictional barrier to the filing of judicial complaints that fail to comply with that provision."); *see also Spinelli*, 446 F.3d at 162 (explaining that under the Rehabilitation Act, "[s]uch 'jurisdictional exhaustion,' as we have called it, may not be excused"); *accord Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 706 (D.C. Cir. 2009) ("Because we hold that the CAA's counseling and mediation requirements are jurisdictional, the district court correctly ruled that it was not empowered to apply the equitable doctrine of vicarious exhaustion to excuse compliance with those requirements."); *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("If the statute does mandate exhaustion, a court cannot excuse it.").  As such, even if the Department did not previously raise the exhaustion argument, the Court cannot hear the plaintiff's failure to accommodate claims because she did not timely contact an EEO counselor within 45 days of the Department issuing a decision that she viewed as discriminatory.  As such, Ms. Doak's failure to accommodate claim in Count II must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

---

proceedings on grounds of futility.  777 F. Supp. 2d 86, 90–92 (D.D.C. 2011) (holding on *prudential*, and not jurisdictional grounds, that there "was no reason to excuse" failure to exhaust).  *See also Perry v. U.S. Dep't of State*, 669 F. Supp. 2d 60, 65 (D.D.C. 2009) (finding that "Mr. Perry's failure to comply with the EEOC's 45-day time limit in 29 C.F.R. § 1614.105(a)(1) does not divest the Court of statutory jurisdiction under Section 505 of the Rehabilitation Act" because the State Department finally disposed of Mr. Perry's administrative complaint before Mr. Perry filed suit).  This Court aligns itself with the former line of cases that read the Rehabilitation Act and *Spinelli* as imposing a strict jurisdictional barrier to filing judicial complaints.  And moreover, even if the Court did align itself with the latter two cases, it would not help Ms. Doak, as her claims would still fail on the merits.

Applying that same principle to Ms. Doak's disparate impact claims in Count I,[12] the Court finds that any agency action of which she complained occurring before August 22, 2010 (45 days before October 6, 2010, when she first contacted an EEO counselor), was not properly and timely exhausted in accordance with 29 C.F.R. § 1614.105.[13]  *See Lipscomb v. Winter*, 577 F. Supp. 2d 258, 271–273 (D.D.C. 2008) (finding that acts occurring before the 45-day window to file a complaint with an EEO counselor were time-barred).  As such, those claims are also dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[14]

## C.  Discrimination

Even if the unexhausted claims[15] could survive a motion to dismiss for lack of subject matter jurisdiction, the Court would nevertheless enter judgment for the defendant on the merits

---

[12]     The defendant maintains that the plaintiff failed to address, and therefore conceded, the defendant's arguments pertaining to the failure to exhaust the Count I disparate treatment claims.  *See* Def.'s Reply 5 n.1, ECF No. 18.  The Court finds that the plaintiff's treatment of the defendant's failure to exhaust argument—though terse—did not address any Count in particular, and therefore that the plaintiff's treatment of the issue conceded nothing.

[13]     Those claims are, to the extent they are challenged as adverse employment actions (which is not entirely clear based on the Complaint and Ms. Doak's Opposition brief): the February 22, 2010 and May 24, 2010 letters of Reprimand, the August 9, 2010 Notice of Proposed Removal; and all the AWOL charges included within those letters and the Notice.

[14]     Moreover, Ms. Doak failed to cooperate during the EEO investigation (*see, e.g.*, Doak Dep. at 42:25–43:8, ECF No. 16-13) and that in itself, constitutes a failure to exhaust.  *See Bell v. Donley*, 724 F. Supp. 2d 1, 13 (D.D.C. 2010) ("it is well-established that failure to cooperate in the investigation will be equated with a failure to exhaust administrative remedies." (citing *Rann v. Chao*, 346 F.2d 192, 197 (D.C. Cir. 2003));  *see also Wilson v. Pena*, 79 F.3d 154, 165 (D.C. Cir. 1996) ("if the plaintiff fails to make a good-faith attempt to comply with reasonable agency requests for information, the policy underlying the [exhaustion] doctrine is not served.");  *Smith v. Koplan*, 362 F. Supp. 2d 266, 268 (D.D.C. 2005) ("Courts equate cases of failing to cooperate with the agency as cases where a plaintiff has failed to exhaust her administrative remedies.")

[15]     The claims that remain as timely are: with respect to Count I, the challenge to the September 30, 2010 Notice of Proposed Removal Decision, and all of Count III.

on all Counts, because Ms. Doak has not shown that she was unlawfully discriminated against or retaliated against in violation of the Rehabilitation Act.

The Rehabilitation Act provides that a "qualified individual with a disability" may not "be subjected to discrimination" by any federal agency "solely by reason of her or his disability." 29 U.S.C. § 794(a);  *see also Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010). Claims of discrimination brought under the Rehabilitation Act are analyzed similarly to claims brought under the Americans with Disabilities Act of 1990 ("ADA").  29 U.S.C. § 794(d). Under the ADA, claims of discrimination include disparate treatment claims and failure to accommodate claims.  *See, e.g.*, *Lee v. District of Columbia*, 920 F. Supp. 2d 127, 132–33 (D.D.C. 2013) ("Claims of discrimination under the ADA can take one of four forms: intentional discrimination, disparate impact, hostile work environment, and failure to accommodate." (citations omitted)).  Ms. Doak brings disparate treatment and failure to accommodate claims in this action, and the Court analyzes both in turn.

1. Disparate Treatment

Courts analyze disparate treatment disability discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *See Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288–89 (D.C. Cir. 1998) (en banc)*.*  Under this framework, the plaintiff bears the burden of establishing "a prima facie case of discrimination by a preponderance of the evidence.  If the plaintiff establishes a prima facie case, the employer must then articulate a legitimate, non-discriminatory reason for its actions.  The plaintiff must then demonstrate that the employer's stated reason was pretextual and that the true reason was discriminatory." *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (citing *Stella v. Mineta*, 284 F.3d 135, 144 (D.C. Cir. 2002)).  A plaintiff can establish a prima facie case by showing that "(1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *See Stella*, 284 F.3d at 145 (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)).

The D.C. Circuit, however, has modified the *McDonnell-Douglas* test, finding that "the question whether the employee made out a prima facie case is almost always irrelevant." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Therefore, instead,

> in considering an employer's motion for summary judgment or judgment as a matter of law [in a disparate treatment suit where an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision], the district court must resolve one central question: *Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?*

*Id.* at 494 (emphasis added). The Supreme Court has explained that "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993) (emphasis in original).

Ms. Doak asserts several adverse employment actions: the Department's August 9, 2010, Notice of Proposed Removal, the Department's September 30, 2010, decision to terminate her employment,[16] the Department's general failure to accommodate her disability, the Department

---

[16]     As a threshold matter, the Department argues that there was no adverse employment action here because Ms. Doak was never terminated—but was instead permitted to retire. *See* Def.'s Mot. Summ. J. 27–28, ECF No. 14. Ms. Doak argues that she was constructively discharged because her retirement was not voluntary, and her proposed removal on August 9, 2010, occurred when "she failed to adhere to the 9:00 a.m. start time chosen by her supervisors that did not accommodate her disabilities." Pl.'s Opp'n Mot. 13–14.

An employee's resignation or retirement is presumed to be voluntary, unless the employee overcomes the presumption by showing that the resignation or retirement was involuntary, and therefore qualifies as a constructive discharge. *Aliotta v. Bair*, 614 F.3d 556, 566–67 (D.C. Cir. 2010) (citing *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006) (Rogers,

issuing her letters of reprimand, and the Department charging her with being AWOL. *See, e.g.*, Def.'s Ex. 20, Resp. to Interrogatory 8; Compl. ¶¶ 9, 26, 28, 30.

Regardless of the adverse employment action taken in this case—or whether any of them actually constitutes an adverse employment action—Ms. Doak has not "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated" against her. *Brady*, 520 F.3d at 494. The Department's non-discriminatory reason for proposing to remove Ms. Doak was her perpetual attendance problem. In its August 9, 2010 Notice of Proposed Removal, the Department explained that it was considering Ms. Doak's removal from federal service because of her "medical inability to perform the essential duties of [her] position . . . which have caused [her] to be unable to maintain [her] regular work schedule," as well as her being "absent without leave." Def.'s Ex. 32. That Notice also listed all the dates in 2010—beginning *after* Ms. Doak's February 2010 reprimand for the same problem—in which Ms. Doak was in AWOL status. The

---

J., concurring)). If the plaintiff can show she was constructively discharged, that will constitute an adverse employment action. *Joyce v. Office of Architect of Capitol*, No. 12-1837(JEB), 2013 WL 4758186, at *7 (D.D.C. Sept. 5, 2013).

A plaintiff suffers a constructive discharge when an employer deliberately denies the plaintiff a reasonable accommodation, and the employer knows that the denial will make the plaintiff's working conditions so intolerable that the plaintiff will be forced to resign. *Floyd v. Office of Representative Sheila Jackson Lee*, No. 11-1228(RC), 2013 WL 5429265, at *15 (D.D.C. Sept. 30, 2013). However, an employee's resignation or retirement, when the only other available option for the employee is removal by the employer for-cause, does not qualify as constructive discharge. *Keyes v. District Of Columbia*, 372 F.3d 434, 439–40 (D.C. Cir. 2004) (explaining that when faced with the choice of retirement or for-cause termination, choosing retirement is a difficult choice for the employee, but not an involuntary choice).

The Court need not resolve this difficult issue because, even if it assumes without deciding that Ms. Doak was constructively discharged and therefore suffered an adverse employment action on September 30, 2010, as set forth above, Ms. Doak has not provided sufficient evidence for a reasonable jury to find that the Department's asserted non-discriminatory reason was not the actual reason and that it intentionally discriminated against her. Therefore, to the extent there is any dispute on this issue, it is ultimately immaterial to the outcome of this case.

record shows that from January to July of 2010, Ms. Doak missed over 50 percent of her work hours, and from July 2010 to October 2010, missed over 40 percent of her work hours. *See id.* at 1; Def.'s Ex. 34 ¶ 6. Despite being issued memoranda in January, a reprimand in February, another memorandum in May, and several emails from supervisors in June and July all regarding her poor attendance, Ms. Doak continued to have problems showing up to work on time—or even at all.

The Department also explained that Ms. Doak's absences had negative effects on her team, and caused the team projects she worked on to suffer. As Mr. Souther noted in his Notice of Decision on Proposed Removal, Ms. Doak's "frequent unscheduled absences prevent[ed] [her] from participating in program meetings and other work group collaboration essential to full performance, creating an undue hardship on co-workers required to perform these responsibilities on her behalf." Def.'s Ex. 34 ¶ 3, ECF No. 14-26. In addition, frequent absences caused her co-workers to lose time on their assignments, and also caused her to miss the training required of her position. *Id.* The repeated absences, and the deleterious effect they had on her team at the Coast Guard, therefore served as legitimate reasons for terminating Ms. Doak that are distinct from her disability.

Ms. Doak has provided no evidence to the contrary indicating that this reason was pretextual and that discrimination because of her disability was the real reason. She does not dispute that she had an attendance problem, but instead argues that her "absences were due to Defendant's failure to accommodate her" by failing to allow her to come in later in the day and alter her work schedule. Pl.'s Opp'n Mot. 14–15, ECF No. 17. But her failure to accommodate claim is a separate claim that is addressed below. Ms. Doak has presented no evidence that her supervisors discriminated against her because of her disability or harbored any animus against

disabled individuals.  Ms. Doak therefore failed to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for terminating her.  *See Brady*, 520 F.3d at 494.

## 2.  Reasonable Accommodations

Ms. Doak next asserts that the Department discriminated against her by failing to reasonably accommodate her disability.  To establish a prima facie case of discrimination based on the failure to accommodate under the Rehabilitation Act, a plaintiff must proffer evidence from which a reasonable fact-finder could find that (1) she had a qualifying disability within the meaning of the statute, (2) her employer had notice of the disability, (3) with reasonable accommodation, she could perform the essential functions of the position, and (4) she requested an accommodation but the employer denied her request.  *See Graffius v. Shinseki*, 672 F. Supp. 2d 119, 125 (D.D.C. 2009) (citing *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002)).  In the D.C. Circuit, failure to accommodate claims are not subject to the *McDonnell Douglas* burden-shifting framework.  *See Aka*, 156 F.3d at 1288 (explaining that the plaintiff's "reasonable-accommodation claim . . . is not subject to analysis under *McDonnell-Douglas*, but has its own specialized legal standards"); *accord Graffius*, 672 F. Supp. 2d at 125 n.8.

### a.  Accommodations made in the workplace

The D.C. Circuit has explained that "an employer is not required to provide an employee that accommodation he requests or prefers, the employer need only provide some reasonable accommodation."  *Aka*, 156 F.3d at 1305 (quoting *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996)).  The regulations governing accommodations under the ADA, and in turn, the Rehabilitation Act, define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is

customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). A "qualified individual" under the Rehabilitation Act is one who "satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

In this case, Ms. Doak's doctor, Dr. Berbano recommended that six accommodations be made regarding Ms. Doak's disabilities of migraines, sleep apnea, depressive disorder, and hypothyroidism: (1) telecommuting from home, (2) full-spectrum light for her work space, (3) anti-glare computer screen, (4) work in an area less subject to cold air currents,[17] (5) adjustment of work schedule to 11 a.m. to 7 p.m., (6) consideration of optional weekend hours. *See* Def.'s Ex. 16, ECF No. 16-5. Dr. Schwartz, the Coast Guard doctor who reviewed Dr. Berbano's suggestions recommended that Mr. Cohen grant the following accommodations to Ms. Doak: (1) the addition of fluorescent light filters to existing lights, (2) an anti-glare filter for the computer monitor, (3) use of sunglasses or anti-glare glasses, (4) noise-canceling headsets, and (5) a dark, private area for use when medically necessary. *See* Def.'s Ex. 17, ECF No. 16-6. The only requests she did not recommend were the adjusted work schedule hours and telecommuting, which she did not view as medically supported. *See* Schwartz Dep. at 12:12–13:14, ECF No. 16-15.

---

[17] It is not clear from the record whether this accommodation was ever granted. Dr. Schwartz did not recommend this to Mr. Cohen, and Mr. Cohen did not include this accommodation in his May 6, 2010 letter to Ms. Doak. However, it seems that Ms. Doak rejected Mr. Cohen's cubicle move suggestion because there was an air vent above the new cubicle that would have put cold air directly on her head. *See* Doak Dep. at 138:24–25, 139:1. Thus, her decision to remain at her regular cubicle appeared to cure the problem. Regardless, neither party suggests that the failure to resolve an air current issue is what caused Ms. Doak's excessive tardiness and absenteeism.

Mr. Cohen immediately implemented all of Dr. Schwartz's suggestions. The email correspondence on the record shows that Mr. Cohen worked diligently to ensure that Ms. Doak had an accommodated work space immediately. *See, e.g.*, Cohen Dep. 22:9-14, ECF No. 14-2. ("The goal was always to get Edna back to work, so I provided everything in this April 28, 2010 [Dr. Schwartz] memo as best as I could."). For instance, on May 5, 2010, Mr. Cohen contacted a Facilities Specialist to request that three overhead lights be turned off above Ms. Doak's cubicle. *See* Def.'s Ex. 21, ECF No. 14-17. His May 6, 2010 letter to Ms. Doak also explained that he provided Ms. Doak with an anti-glare device for her computer and noise-cancelling headsets, allowed her to wear sunglasses in the office, and provided her a dark, private area for use when medically necessary. *See* Def.'s Ex. 19 ¶ 3, ECF No. 16-7. When Ms. Doak expressed dissatisfaction with her cubicle location, Mr. Cohen offered to move her to a different cubicle, "farther from the bright glare of the windows," which Ms. Doak did not accept, explaining that she needed to check with the union first. *Id.* ¶3.d. Though the Department did not ultimately implement every accommodation requested by Ms. Doak, it did make reasonable accommodations, which is all the law requires it to do. *See Aka*, 156 F.3d at 1305.

### b. Modified work schedule

Ms. Doak takes issue with the fact that the Department "denied [her] requests to telework,[18] arrive at a later start time of 11:00 a.m., and to work optional weekend hours" to make up any lost time during the week. *See* Pl.'s Opp'n Mot. 12. The ADA, and in turn, the Rehabilitation Act defines "reasonable accommodation" to include "part-time or modified work

---

[18] The Department also explained, and it is clear from the record that Ms. Doak never made an appropriate, formal request to telework. *See* Def.'s Resp. to Interrogatory 2 at 2–3, ECF No. 16-1 ("Plaintiff never made an appropriate, formal request to telework in the manner required of all employees . . . [t]hus, because Plaintiff never submitted a formal request, there was no request to deny.").

schedules." 42 U.S.C. § 12111(9)(B).  Indeed, the D.C. Circuit has explained that section 501 of

the Rehabilitation Act "requires an agency to consider work at home . . . as [a] potential form[]

of accommodation."  *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir 1994);  *see also Langon v. HHS*,

959 F.2d 1053, 1060–61 (D.C. Cir. 1992);  *McNair v. District of Columbia*, No. 12-248(JEB),

2014 WL 242913, at *4 (D.D.C. Jan. 23, 2014) ("It is true that an employer must consider

telecommuting as a potential form of reasonable accommodation.").

 As courts in this jurisdiction have explained, the modified work schedule as a reasonable

accommodation analysis generally turns on the nature of the position for which the employee is

requesting the accommodation.  For instance, in *Carr v. Reno*, the plaintiff requested, *inter alia*,

a flexible arrival time to work, because she had an ear disability that caused her periodic

dizziness, nausea, and vomiting, and that made it difficult for her to make it into work at her

scheduled 8:00 a.m. arrival time.  23 F.3d at 527, 529, 531.  Her employer denied that request

because of a daily 4:00 p.m. deadline that the employer had to make, that it would not be able to

if Ms. Carr could not arrive to work at 8:00 a.m. each day and work a full eight-hour shift.  *Id.* at

530.  The court held that "to require an employer to accept an open-ended 'work when able'

schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd

proportions and imperil the effectiveness of the employer's public enterprise."  *Id.* at 531.  The

daily deadline, in other words, was the critical element of her position that rendered the

employee's proposed accommodation of a flexible work time unfeasible.  *See Breen v. Dep't of

Transp.,* 282 F.3d 839, 843 (D.C. Cir. 2002).

 In contrast, in *Langon*, the plaintiff, who suffered from multiple sclerosis, requested that

she be allowed to perform her job as a computer programmer at home.  *See Langon*, 959 F.2d at

1054–55.  The court found that summary judgment for the employer was inappropriate because

there was a genuine dispute of material fact as to whether the plaintiff could have performed the essential functions of her job—computer programming—at home. *See id.* at 1061. Similarly in *Breen*, the court found summary judgment for the employer inappropriate because there was no "critical element" to the plaintiff's position that made her proposed alternative work schedule, which included an "hour of quiet time after business hours to do solid filing," incompatible with the essential functions of her position as a file clerk. 282 F.3d at 840, 843.

Lower courts have interpreted *Langon*, *Carr*, and *Breen* as establishing a dichotomy wherein a specific and well-defined accommodation is deemed reasonable, and an erratic and unpredictable accommodation, such as an open-ended "work whenever you want schedule" is unreasonable as a matter of law. *See, e.g.*, *Solomon v. Vilsack*, 845 F. Supp. 2d 61, 71 (D.D.C. 2012) ("D.C. Circuit precedent makes clear that an employee's request to work whenever he or she wants is unreasonable as a matter of law. On the other hand, specific and well-defined accommodations are not unreasonable." (internal quotation marks and citations omitted)); *Scarborough*, 190 F. Supp. 2d at 26 n.21 (explaining that a request "to work only on the infrequent and unpredictable occasions" that the plaintiff felt able "was nothing like the specific and well-defined accommodations at issue in *Langon* and *Breen*, and thus was not reasonable"). Other courts have also agreed with this legal proposition. *See Fisher v. Vizioncore, Inc.*, 429 F. App'x 613, 616 (7th Cir. 2011) (noting that "an open-ended schedule with the privilege to miss workdays frequently and without notice" is not reasonable as a matter of law); *E.E.O.C. v. Yellow Freight Sys., Inc.,* 253 F.3d 943, 949 (7th Cir. 2001) (explaining that "the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability") (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 484 (7th Cir. 1999)).

For instance, in *Scarborough v. Natsios*, the court found that the plaintiff's request for leave without pay anytime that he was unable to report to work because of his chronic flu-like symptoms was unreasonable as a matter of law. 190 F. Supp. 2d at 25. The court elaborated that the plaintiff's request that he be granted leave "in an erratic, unpredictable manner—whenever [the] plaintiff felt he needed to miss work"— was unreasonable as a matter of law, citing *Carr*. *Id.* The court similarly found such a "work whenever the employee wants" schedule request unreasonable as a matter of law in *Solomon v. Vilsack*, 845 F. Supp. 2d at 72–73. In that case, the plaintiff Ms. Solomon's ordinary working schedule was 7:30 a.m. to 6:00 p.m., four days a week, with Wednesdays off. *Id.* at 67. She requested a flexible schedule generally, and asked her employer if she could take it "day-by-day" because she was experiencing difficulty working her scheduled hours in light of her disability that included various mental health disorders. *Id.* at 72. The court found that because "she did not seek to shift her schedule in this matter on any predictable or regular basis," her request was really a request for "an open-ended schedule." *Id.* As such, it was unreasonable as a matter of law. *Id.* at 73.

Like the requests made by the plaintiffs in *Solomon* and *Scarborough*, Ms. Doak's request falls into the camp of the open-ended "work whenever you want" schedule that is unreasonable as a matter of law. In her initial April 2010 request for accommodations, Ms. Doak requested to be able to telework, to be given an adjusted schedule of 11:00 a.m. to 7:00 p.m., and to be allowed to make up missed hours on the weekend. *See* Def.'s Ex. 16. Though the alternative hours request was specific enough, in Ms. Doak's case, it was neither predictable nor an achievable reality. From April 2010 until she was notified of her removal in September 2010, Ms. Doak's attendance record was all over the place. Mr. Souther's Notice of Proposed Removal of Ms. Doak dated August 9, 2010 illustrates this. *See generally* Def.'s Ex. 32. For

instance, Ms. Doak was AWOL for the entire day on May 10, May 11, and May 20, and August 2, 2010. *Id.* She was AWOL for half the day or more on May 18, May 19, June 1, June 28, July 8, July 9, July 16, and July 21, 2010. *Id.* She also had hours in AWOL status (ranging from 15 minutes to 3 ¾ hours) on thirty-two (32) other work days between May and August 2010. *See id.; see also* Ex. 28, ECF No. 16-11 (listing all the dates in 2010 that Ms. Doak was absent or late and the reasons why).[19]

Moreover, it is undisputed that Ms. Doak's schedule was unpredictable. Ms. Doak herself testified that her arrival time to work was inconsistent, regardless of the start time she requested, *see* Doak Dep. 51–52, and that sometimes she would arrive to work as late as 2:00 p.m. *Id.* at 51:21–22. Ms. Doak also stated that sometimes she was "knocked out" for the entire day and not able to get up or come into work at all, let alone late. Doak Dep. at 51:16–17. In addition, the Department explained that Ms. Doak's inconsistent work schedule made it difficult

---

[19]    Ms. Doak includes her biweekly pay statements as an exhibit to her brief. *See* Pl.'s Ex. 9, ECF No. 17-1. Without pointing to relevant pages or directing the Court to anything in particular about these statements, it is difficult for the Court to decipher their purpose, or whether they create any dispute of material fact as to her AWOL hours. The court need not engage in a fishing expedition looking itself for a genuine issue of material fact. *See Potter v. District of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J., concurring) (explaining that Local Rule 7(h)'s requirement that an opposition to a summary judgment motion be accompanied by a separate concise statement of genuine issues setting forth all material facts that includes references to parts of the record relied on to support the statement "embodies the thought that judges 'are not like pigs, hunting for truffles buried in briefs' or the record") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). That being said, the Court notes that the Department's records regarding Ms. Doak's time in AWOL status are corroborated by Ms. Doak's pay statements. For instance, in the pay period from May 9, 2010 to May 22, 2010, Ms. Doak's pay statement reflects that she was in AWOL status for 8 hours on May 10, May 11, and May 22, 2010.

Moreover, in her deposition, Ms. Doak repeatedly stated that the Department's numbers regarding her AWOL status were "inaccurate." *See* Doak Dep. at 252–253. However, Ms. Doak's pay statements generally reflect large periods of absences throughout 2010, and Ms. Doak herself never performed an independent analysis to see if the Department's numbers were correct. *See id.* at 253:23–24. Because the plaintiff has not pointed to anything on the record to create a genuine issue of material fact, the Court considers the facts regarding her hours undisputed.

to try to accommodate her. *See* Souther Dep. at 41 ("Based on the information I had . . . there were days [Ms. Doak] didn't come to work at all, there were days she came in at 2:00 or 2:30, there were days she was in by 11:00, there were days she was in by 9:00 . . . ."); Pennington Dep. at 17–18 ("Ms. Doak had unpredictable episodes of pain that required medication that had serious side effects, and because both the episodes were unpredictable and the side effects of the medications were incapacitations, that a fixed work schedule was not possible because of the unpredictability of her unstable medical condition."); Pennington Mem., Def.'s Ex. 26, ECF No. 16-10 ("Dr. Berbano indicated that Ms. Doak has a condition that causes her to be 'incapacitated due to the pain.' Additionally, the treatment for these incapacitating episodes completely incapacitate[s] her. These medical episodes are unpredictable and unless they are stabilized Ms. Doak will not be able to work a predictable work schedule."). In the end, Ms. Doak's requested work accommodation was an unpredictable, flexible schedule that allowed her to come into work whenever she could make it. This was unreasonable as a matter of law. *See Solomon*, 845 F. Supp. 2d at 71–73; *Scarborough*, 190 F. Supp. 2d at 25–26. Making it to work regularly is an essential function of the job that Ms. Doak could not muster even with the requested accommodation.[20]

---

[20] Ms. Doak also argues that the Department failed to accommodate her because it failed to take part in the interactive process. *See* Compl. ¶ 28. There is no independent cause of action for failure to engage in the interactive process—under the ADA, and in turn, the Rehabilitation Act, there is only a cause of action for failure to accommodate generally. *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100–01 (2d Cir. 2009) ("failure to engage in an interactive process does not form the basis of an ADA [and in turn, a Rehabilitation Act], claim in the absence of evidence that accommodation was possible"); *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951–52 (8th Cir. 1999) (explaining that many circuits hold that "an employer cannot be held independently liable under the ADA [and in turn, the Rehabilitation Act], for simply failing to engage in an interactive process to determine reasonable accommodations" and holding that "there is no per se liability under the ADA if an employer fails to engage in an interactive process"). The analysis for the failure to accommodate claim is set forth above.

Moreover, Ms. Doak's physical presence was required at work, making telecommuting in addition to, or instead of, a modified hourly schedule, an unreasonable accommodation. The reasonable accommodation analysis established by *Carr*, *Langon*, and *Breen* and their progeny turns, to a degree, on whether the plaintiff's physical presence at work was an essential function of her job.[21] Most recently, this Court has explained that "the few cases that touch on this precise subject suggest that if the job in question requires that an employee be present—that is, the employee can perform the essential function of her job only by being in the office—the employer need not grant a telecommuting request." *See McNair*, 2014 WL 242913, at *4. In *McNair*, the court concluded that the employer did not need to provide the plaintiff's accommodations because the essential functions of her job could only be completed from her employer's physical headquarters. *Id.* at *5–6.

In this case, the Department explained that Ms. Doak's need to work with her team made an adjusted work schedule or telework impracticable. Ms. Doak's colleagues arrived at work anytime between 6:00 a.m. and 8:00 a.m., *see* Souther Dep. at 28–31, and conducted meetings,[22]

---

[21] While courts generally hold that regular work attendance is an essential function of a job, *see, e.g.*, *Carr*, 23 F.3d at 529 (explaining that "coming to work regularly" was an essential function of the job); *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d 190, 200 (1st Cir. 2011) ("[a]t the risk of stating the obvious, attendance is an essential function of any job" (citations omitted)); *Rosell v. Kelliher*, 468 F. Supp. 2d 39, 45–46 (D.D.C. 2006) ("One of the most fundamental requirements of any position is reporting for work."), courts do not hold that, *as a matter of law*, physical presence is required in order "to fulfill this essential function of attendance." *Valle-Arce*, 651 F.3d at 200; *McMillan v. City of New York*, 711 F.3d 120, 126–27 (2d Cir. 2013) ("Physical presence at or by a specific time is not, as a matter of law, an essential function of all employment."). Rather, the analysis is whether the plaintiff's physical presence was required during specific business hours because of the nature of the position, and therefore whether the plaintiff's requested accommodation of flexible start times would have impaired an essential function of the job. *Id.* at 127.

[22] The record is unclear as to the exact start times of these meetings, but it is clear they occurred in the morning. It appears that in May 2010, Ken King, a new manager took over Ms. Doak's division and implemented morning meeting times instead of afternoon meeting times. *See* Doak Dep. at 143–144, 238.

and had regular team interactions that required a physical presence in the building. Ms. Doak's job description included attending spontaneous meetings with program managers that "often requires attendees to review the same documentation at the same time" and, as the Department explained, having an off-site employee look at that document "compromise[d] the efficiency with which this work can be performed." *See* Def.'s Resp. to Interrogatory 3, Def.'s Resp. to Interrogatory 5, ECF No. 16-1. The Department also explained that the USCG Acquisitions Program often worked on short deadlines and the "pace of work / operations can sometimes be too fast for anything other than on-site presence." Def.'s Resp. to Interrogatory 5. In addition, the Coast Guard's Acquisition Directorate explained that "[w]ork must be performed between the hours of 0600-0800, with all CG-9 employees/members present during the core hours of 0930-1030 and 1330-1430." Def.'s Ex. 7 ¶ 7(a)(1). Ms. Doak's late arrival substantially diminished the amount of time she would be able to partake in these daily, much-needed interactions with her teammates, and prevented her from being present during core hours. For instance, if she arrived at 11:00 a.m., she would have anywhere between three and five fewer hours per day to interact with her colleagues on projects—her colleagues who arrived to work at 6:00 a.m. would be gone by 2:30 p.m. or 3:30 p.m. (depending on whether they were on a nine-hour or eight-hour shift, with thirty minutes for lunch). *See* Souther Dep. at 29; *see also* Def.'s Statement Undisputed Facts ¶ 43; Def.'s Ex. 19 ¶ 4 (explaining that "you will not be able to meet those obligations [of interacting daily and frequently with the project staff] with a work schedule that does not have you arrive until 1100 daily and therefore would place the project and resource office in a hardship position by requiring personnel from other projects to attend these meetings on the behalf of the resource office."). Thus, Ms. Doak's request for telecommuting was not a

reasonable request because her physical presence at the office was required for more than the few hours per day, if at all, that she was making it in.

Even if Ms. Doak's physical presence at work was not required, however, Ms. Doak was still not able to telework effectively because her disability incapacitated her regardless of where she was, and thus she could not perform the essential function of her job even with an accommodation. Even if she had been granted the accommodation of teleworking or weekend hours, she still would not have been able to perform any work if a migraine struck. *See, e.g.*, Def.'s Ex. 25, Dr. Berbano Mem. ("Ms. Doak suffers from periodic migraines. When she experiences acute onset of a migraine, she is incapacitated due to the pain and cannot concentrate on the tasks at hand, *whether at her job or at home* performing routine activities of daily living . . . .") (emphasis added); Doak Dep. at 145:3-14 (explaining that she would "likely not" be able to work *either at home or at the office* when she was suffering from a migraine) (emphasis added). Thus, whether she was working in the office or from home, she still required a "work when I can" schedule that is unreasonable as a matter of law.[23]

In sum, the Department implemented all the reasonable office accommodations Ms. Doak requested because of her disability, and only denied Ms. Doak's requests for telework and a modified schedule because they were unreasonable as a matter of law. The Department therefore reasonably accommodated Ms. Doak and did not discriminate against her on the basis of her disability.

---

[23]     Importantly, Ms. Doak's unpredictable incapacitation was not limited to the morning. For instance, when Ms. Doak attended an office holiday party on December 18, 2009, she arrived to the party around 2:00 p.m. (after calling in sick that day). *See* Def.'s Ex. 20, Resp. to Interrogatory No. 21, ECF No. 14-16. Forty-five minutes after she arrived, her migraine returned and she had to take a nap, which she did in "the Chiefs' Mess" until 8:00 p.m. *Id.*

### D. Retaliation

Ms. Doak's final claim is that the Department retaliated against her by deciding to terminate her in response to her request for reasonable accommodations. *See* Compl. ¶ 30. The ADA, and in turn, the Rehabilitation Act, also contains an anti-retaliation provision. *See Mogenhan*, 613 F.3d at 1165 (quoting 29 U.S.C. § 794(d)). The elements of retaliation and discrimination claims are the same under Title VII and the Rehabilitation Act. *Id.*; *see also Munro v. LaHood*, 839 F. Supp. 2d 354, 360 (D.D.C. 2012). As such, retaliation claims are also governed by the *McDonnell Douglas* burden-shifting framework. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). To establish a prima facie case of retaliation, which is the first step in the burden-shifting analysis, the plaintiff must show "(1) that [s]he engaged in [a] statutorily protected activity; (2) that [s]he suffered a materially adverse action by h[er] employer; and (3) that a causal link connects the two." *Id.; see also Taylor v. Solis*, 571 F.3d 1313, 1320 (D.C. Cir. 2009). Though discrimination and retaliation claims are similarly analyzed, the D.C. Circuit has explained one difference in the elements: that "'[a]dverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2009). This is because, "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)). The D.C. Circuit has since elaborated that "materially adverse action" in the retaliation context "means [that] it well might have dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Mogenhan*, 613 F.3d at 1166 (quoting *Burlington N.*, 548 U.S. at 68); *accord Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010).

"[Once] the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for its actions." *Jones*, 557 F.3d at 677 (internal quotation marks and citation omitted). "If the employer does so, the burden-shifting framework disappears, and a court . . . looks to whether a reasonable jury could infer . . . retaliation from all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and other evidence of retaliation." *Id.* (internal quotation marks omitted).

Ms. Doak argues that she has established a prima facie case of retaliation because she "participated in protected activity by requesting accommodations," "suffered an adverse action when she was forced to resign," and "there is a causal link between [her] requests for accommodations from April 16, 2010 through July 16, 2010" and the Department's first step in removing her in its proposed removal notice of August 9, 2010. *See* Pl.'s Opp'n Mot. 14. "A plaintiff may satisfy [the causal link] . . . element of a prima facie case by showing 'the employer had knowledge of the employee's protected activity, and . . . the adverse personnel action took place shortly after that activity.'" *Holcomb v. Powell*, 433 F.3d 889, 903 (D.C. Cir. 2006) (quoting *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985)). The Court need not decide whether there is sufficient temporal proximity here,[24] because once the employer proffers a

---

[24] The D.C. Circuit has required "'positive evidence beyond mere proximity . . . to defeat the presumption that the [employer's] proffered explanations are genuine.'" *Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)). *See also Woodruff*, 482 F.3d at 530 ("If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim.").

legitimate non-discriminatory reason for the adverse employment action, the prima facie case drops out and the ultimate issue is "whether a reasonable jury could infer retaliation from all the evidence." *Jones*, 557 F.3d at 677.

As set forth above, the Department's decision to remove Ms. Doak was due to her repeated absences, her failure to comply with leave procedures, and the effect of both on her team at the Coast Guard. Ms. Doak has not provided any evidence that this reason was pretextual and that the real reason for terminating her was retaliatory. Based on the fact that Ms. Doak missed nearly 50 percent of her work hours in 2010, no reasonable jury could conclude that chronic absenteeism and tardiness was not the real reason for Ms. Doak's termination and instead, that retaliatory animus was behind the Department's decision to terminate Ms. Doak's employment. As such, the Court must enter judgment for the Department on this claim.

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion is GRANTED. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 10, 2014                                    RUDOLPH CONTRERAS
                                                           United States District Judge